Daniel and Jarlene HATFIELD, et al.

v.

COMMISSIONER OF INLAND FISHER-
IES AND WILDLIFE and Commission-
er of Public Safety, et al.

Supreme Judicial Court of Maine.

Argued Oct. 4, 1989.
Decided Nov. 28, 1989.

Richard L. O'Meara (orally), Murray, Plumb & Murray, Robert E. Mittel, M.C. L.U., Portland, for plaintiffs.

James E. Tierney, Atty. Gen., Cabanne Howard (orally), Deputy Atty. Gen., Augusta, for defendant.

Before McKUSICK, C.J., and
ROBERTS, WATHEN, GLASSMAN,
CLIFFORD, HORNBY and COLLINS,
JJ.

COLLINS, Justice.

A plaintiff class composed of people who canoe upon the Saco River brought a class action before the Superior Court of Kennebec County (*Alexander, J.*) challenging the constitutionality of a "riverblock" operation that was conducted jointly by the Department of Public Safety and the Department of Inland Fisheries and Wildlife on the banks of the Saco River on three weekend days in mid–1988. The officers at the riverblock operation stopped and questioned all canoeists on the Saco River without either probable cause or a reasonable and articulable suspicion that any individual canoeist was involved in criminal activity. In addition to this initial seizure and detention, some canoeists were subjected to intrusive searches of their persons or effects. In a declaratory judgment, the Superior Court held that the riverblock operation as conducted violated the Fourth Amendment of the Constitution of the United States and Article I section 5 of the Constitution of the State of Maine. We affirm.

The Superior Court justice made extensive findings of fact in this case, which

were, for all intents and purposes, undisputed by the State Defendants. State troopers and liquor inspectors of the Department of Public Safety and game wardens of the Department of Inland Fisheries and Wildlife ("State Defendants") jointly conducted a riverblock/checkpoint stop and search operation on the banks of the Saco River on May 28, June 18, and July 16, 1988. The goal of the riverblock program was to deter raucous and illegal conduct engaged in by some canoeists through a show of force and a law enforcement presence on the river during the day on selected weekends when large numbers of canoeists were anticipated.

Each checkpoint involved between six and ten law enforcement officers and one or two police dogs stationed at temporarily fixed sites on the riverbank east of the Route 5 bridge. All of the officers were armed, and the officers had the use of a privately-owned motorized airboat on each occasion. The police dogs, one of which was trained in narcotics detection, were sometimes allowed to roam freely in and near the shallow water at the edge of the river, often walking between and among the canoes being detained, and sniffing the canoes and canoeists present at the site.

There was no policy, written or otherwise, developed by supervisory officers within the Warden Service, or the Department of Public Safety to govern the procedures to be used by the officers on duty at the Saco River Checkpoints. Nor did the officers on duty receive any instructions or orders from their supervisory officers regarding the procedures to be followed. Nevertheless, a routine procedure developed.

The riverblock operations stopped all persons canoeing down the Saco River at the fixed checkpoint and detained the canoeists for periods ranging from a few minutes to 10 to 15 minutes or more to determine whether there were any safety violations apparent and whether there was any evidence of illegal activity with regard to alcohol and drugs. Approximately 1,000 to 2,000 canoes were stopped on each of the three dates. Generally the canoes held two

persons, so as many as 4000 persons may have been subject to any one checkpoint operation. There was no advanced notice to the public of the riverblock operation. Canoeists typically had no warning of the checkpoint until they observed the officers on the riverbank several yards ahead. It was impossible for canoeists to avoid the checkpoints unless they abandoned their trip or stopped to camp upstream of the checkpoints.

Although the officers generally stopped all canoes travelling down the Saco River, during certain times when the backup of detained canoes became unmanageable some canoes were allowed to bypass the checkpoint by simply displaying their personal flotation devices.

Upon being stopped, canoeists were asked to display their personal flotation devices and any applicable fishing licenses to the officers. It was routine procedure for the officers then to inquire of all canoeists whether they had any illegal narcotics or other drugs in their possession and to give all canoeists an opportunity to surrender any illegal narcotics or other drugs. Some officers informed canoeists that they would not be prosecuted if they voluntarily surrendered any contraband, but would be placed under immediate arrest if they did not voluntarily surrender any illegal contraband and such contraband was discovered in the course of a subsequent search. It was also routine procedure for the officers to inquire of all canoeists whether they had any alcohol aboard their canoes, and if so to identify the state in which they purchased such alcohol. The canoes and containers in the canoes of any canoeist who admitted to having out-of-state alcohol but who was uncertain of the amount were searched.

Between 20 and 50 violations of law were identified on each checkpoint day, with the most prevalent violations being insufficient life jackets, 12 M.R.S.A. § 7801(16)(A) (1981), importation of too much beer, 28–A M.R.S.A. § 2077 (1988), fishing without a license, and possession of marijuana—a civil violation. An occasional charge involved

possession of drug paraphernalia or possession of alcohol by a minor.

Daniel and Jarlene Hatfield canoe frequently on the Saco River and were stopped at the riverblock on May 28, 1988. At the time that they were stopped, the Hatfields had approximately three cans of beer and no illegal narcotics or other drugs. The Hatfields were asked to display their flotation devices, and then were informed that they should surrender any drugs or illegal narcotics.

Daniel Hatfield was then asked to stand up and empty his pockets, and he was subjected to a search which included a pat down of his body and the pulling open of his waistband for inspection inside his shorts. Jarlene Hatfield was subjected to a search of her purse and camera case, both of which contained multiple zippered compartments. Three coolers and some of the plastic joint-compound buckets aboard the Hatfields' canoe were searched. The Superior Court determined that the searches were made in the absence of probable cause, and found that the searches did not uncover any contraband or evidence of illegal activity. The Hatfields were detained for approximately 20 minutes.

Daniel and Jarlene Hatfield brought a civil rights class action against the State Defendants in Superior Court, Kennebec County, on behalf of themselves and persons who travel by canoe, or who will in the future travel by canoe on the Saco River, and who desire not to be subjected to riverblock stops. The Plaintiff Class sought to enjoin the State Defendants from conducting future riverblock operations on the grounds that such riverblock operations are unconstitutional under the Fourth and Fourteenth Amendments to the Constitution of the United States and under Article I section 5 of the Constitution of the State of Maine. The Superior Court (Kennebec County, *Alexander, J.*) certified the Plaintiff Class in the Court's Opinion and Order, dated January 5, 1989, determining the named parties to be proper representatives of a general class that includes all persons who have canoed on the Saco river in the past and who expect to canoe the Saco

River in the future, including both those who have encountered a riverblock and those who have not, and who object to riverblock operations. The State does not challenge the class certification on appeal.

The Superior Court's Opinion and Order dated January 5, 1989 (as amended February 3, 1989), which was framed in the form of a declaratory judgment rather than in the form of an injunction, declared that the riverblock stops as practiced in 1988 violated canoeists' rights under the Fourth Amendment of the United States Constitution and Article I section 5 of the Maine Constitution. The State Defendants have appealed to the Law Court.

█ The first issue that we must address is whether the admittedly unconstitutional search of the Hatfields and their property is relevant to the constitutionality of the riverblock operation as a whole. The State Defendants admit that the searches of the Hatfields' persons and effects were conducted without probable cause and therefore were unconstitutional. Moreover, the State Defendants do not defend these searches in their appeal. Nevertheless, the State Defendants declare that these unconstitutional searches were nothing more than "isolated incidents" or "departures" from normal, appropriate procedures. The State Defendants argue that the search of the Hatfields is irrelevant to this appeal because any "deficiencies" in the 1988 riverblock operations "can be corrected without invalidating the riverblock as a whole." Further, the State Defendants allege that the Superior Court did not rely on the search of the Hatfields or any other possible departures from appropriate procedure in the conduct of the riverblock in its determination that the riverblocks are unconstitutional.

We find the search of the Hatfields and their property relevant to this appeal. We review the constitutionality of the riverblock procedures as they were actually carried out in 1988, not as they might be carried out in the absence of admittedly unconstitutional searches. "Justiciability requires that there be a real and substantial controversy, admitting of specific relief

# 740

through a judgment of conclusive character as distinguished from a judgment merely advising what the law would be" if certain events should occur in the future. *Connors v. International Harvester Credit Corp.*, 447 A.2d 822, 824 (Me.1982). "Rights must be declared upon the existing state of facts and not upon a state of facts that may or may not arise in the future." *Id.* If this Court were to ignore the unconstitutional searches of the Hatfields and their property for purposes of ruling on this appeal, we would do nothing more than issue an advisory opinion on the constitutionality of an imaginary law enforcement procedure that never occurred.

Additionally, examination of the record reveals that the State Defendants' assertion that the Superior Court did not rely upon the search of the Hatfields is mistaken. First, the Superior Court's Order and Opinion, dated January 5, 1989, addresses the constitutionality of the riverblock "as actually practiced in 1988," not as it could be operated in the absence of searches like that of the Hatfields, and referred to "the stops *and searches*" incident to the riverblock throughout its discussion of the riverblock's constitutionality. (Emphasis added). Second, at oral argument on the State Defendants' motion to amend the Superior Court's findings and judgment, the Superior Court emphasized that its conclusions in its Opinion and Order were based on "the totality of the circumstances ... [of] the riverblocks *as conducted in 1988*." (Emphasis added). Third, by certifying the Hatfields as proper representatives of their respective class, and by stating that the Hatfields' "concern about their stop, derived from their experience in the past ... is a legitimate interest which may be properly asserted" for the entire class, the Superior Court indicated that it did not dismiss the admittedly unconstitutional search of the Hatfields as an "isolated incident."

■ The second issue before this Court is whether the riverblock operations were constitutional. Because the riverblock operations as actually conducted in 1988 involved admittedly unconstitutional searches we find that they violated the Fourth and Fourteenth Amendments of the Federal Constitution and Article I section 5 of the Maine State Constitution.

The entry is:

Judgment affirmed.

All concurring.